**WO**                  JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT
# OF ARIZONA

| | |
|---|---|
| Joseph L. Druce, | No. CV-23-00858-PHX-MTL (JFM) |
| Plaintiff, | |
| vs. | **ORDER** |
| Ryan Thornell, et al., | |
| Defendants. | |

Plaintiff Joseph L. Druce, who is confined in the Arizona State Prison Complex-Lewis, Rast Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Centurion Health. (Doc. 13.) Before the Court is Defendant's Motion for Summary Judgment. (Doc. 55.) The Court will deny Defendant's Motion.

**I.  Background**

In his Second Amended Complaint, Plaintiff alleged that Defendant delayed treatment for a detached retina in his left eye, which led to a delay in obtaining surgery and caused Plaintiff to lose vision in the affected eye. (Doc. 13.) On screening, the Court determined that Plaintiff sufficiently stated an Eighth Amendment medical care claim against Defendant. (Doc. 14.)

Defendant moved for summary judgment on the grounds that (1) Plaintiff cannot demonstrate there is a policy or practice that caused an alleged constitutional violation, (2)

1  Plaintiff cannot show deliberate indifference, and (3) punitive damages are not warranted.
2  (Doc. 55.)[1]

3  **II.  Summary Judgment Standard**

4  A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must

---

[1] Upon the filing of Defendant's Motion for Summary Judgment, the Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Plaintiff of the requirements under Federal Rule of Civil Procedure 56 and set a briefing schedule. (Doc. 58.)

believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Relevant Facts**[2]

On May 21, 2022, Plaintiff submitted a Health Needs Request (HNR) asking to see an eye doctor because his left eye was hazy and out of focus, he was going blind, and it scared him. (Doc. 56 at 9.) Plaintiff wrote that at times the back of his eye hurt, as did his left ear, and that reading and writing were difficult. (*Id.*) On May 24, 2022, Nurse Dale Patterson responded to the HNR, noted that it was not urgent, and informed Plaintiff "appointment scheduled." (*Id.*)

On May 24, 2022, Plaintiff submitted an HNR stating that he needed to be put on the nurse line. (Doc. 76-1 at 36.) He wrote, "please, my eye is hurting, feeling like its peeling from the inside and hurting[;] please I need to be seen by the nurse." (*Id.*)[3] There

---

[2] Defendant argues that Plaintiff's Response fails to comply with the rules of procedure and Court orders to include a separate controverting statement of facts and citations to relevant and admissible evidence. (Doc. 78 at 1–2.) Plaintiff's Response and Statement of Facts do not strictly comply with Rule 56; however, strict compliance is not required for consideration by the Court. *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (district courts must "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"). Plaintiff's Response sufficiently sets forth disputes to facts asserted by Defendant, and Plaintiff cites to attached evidence to support his disputes. (*See* Doc. 75 at 6–9.)

Defendant contends that Plaintiff's declarations are self-serving and unsupported. (Doc. 78 at 2.) "That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). Plaintiff has personal knowledge to testify as to his current medical condition, when he was seen by staff, and to whom he complained about his eye issues. (*See* Doc. 76-1 at 3, 20, 44.) *See* Fed. R. Civ. P. 56(c)(4); *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (the district court cannot "disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature[,]" even if it is uncorroborated).

[3] Defendant notes that this HNR, and a couple other HNRs submitted by Plaintiff, do not include a stamp or note at the top of the HNR form indicating that it was picked up by an officer and submitted to Defendant. (Doc. 78 at 6 n.2.) But Defendant does not argue that these particular HNRs were not received by medical staff, nor does Defendant object to this evidence. (*See id.*) Indeed, one of Plaintiff's proffered HNRs that does not include any documentation at the top of the form indicating that it was picked up by an

is no record of a response to this HNR.

On May 24, 2022 Plaintiff submitted another HNR stating that his left eye was hazy and out of focus, he was going blind, this was causing his right eye to go out of focus, he could not see much or watch TV, his backside and left ear hurt, and his pain was now at a 5/8 level, and it was freaking him out. (Doc. 56 at 46.) There is no record of a response to this HNR.

Defendant submits a form titled "Offender Appointment," which states an appointment date of June 2, 2022, was "approved" by Nurse Patterson for an "eye problem"; however, there is no patient name on the form, and Plaintiff did not have an appointment with medical on this date. (Doc. 56 at 10–11.)

On June 2, 2022, Plaintiff submitted an HNR, stating that his eye hurts, his sight is fading and getting fuzzy fast, something is seriously wrong, and he needs to be seen. (*Id.* at 17.) The June 14, 2022 response noted that Plaintiff was "scheduled." (*Id.*) The name of the responding nurse is illegible. (*Id.*)

On June 6, 2022, Plaintiff submitted an HNR stating he needed to be seen because his left eye hurts and he is blind now. (Doc. 76-1 at 37.) He wrote, "why can't I even see a nurse?" (*Id.*) There is no record of a response to this HNR.

On June 12, 2022, Plaintiff submitted an HNR stating that his left eye was extremely sore, three quarters of his eye was blinded by a dark haze, he needed to be seen to get gauze and tape so he can sleep with his eye covered, and he asked to be put on the nurse line. (Doc. 56 at 13.) Nurse Esminia Fuches responded to the HNR, noted that it was not urgent, and wrote "appointment scheduled." (*Id.*)

Defendant submits another form titled "Offender Appointment," which states that an appointment date of June 14, 2022, was "approved" by Nurse Fuchs for a "sore eye";

---

officer is the same as one of the HNRs submitted by Defendant; the Defendant's copy includes an officer's initials and the date the HNR form was picked up. (Doc. 76-1 at 39 (July 2, 2022 HNR); Doc. 56 at 60 (same HNR).) Thus, the absence of an officer's initials at the top of an HNR form is not evidence that the form was not picked up and submitted to Defendant. Regardless, the Court is required to take as true Plaintiff's facts and evidence that he submitted these HNRs to Defendant. *See Anderson*, 477 U.S. at 255.

- 4 -

however, there is no patient name on the form, and Plaintiff did not have an appointment with medical on this date. (*Id.* at 14.)

On June 15, 2022, Plaintiff submitted an HNR stating he had bad pain in his left eye, he was going blind, and he needed to be seen. (Doc. 76-1 at 38.) There is no record of a response to this HNR.

On June 17, 2022, Plaintiff submitted a Health Service Request stating,[4]

> I am blind in my left eye, it is all bubbly/fluids glazing all over, I need to be seen please, it makes my right eye out of focus . . . I need to be seen, I'm freaking out being blind and told by st[a]ff that it is cat[a]racts, and w[ill] need surgery???? Can I be seen thank you and God bless.

(Doc. 56 at 18.) The Health Service Request was reviewed by Nurse Victoria Rosario, who noted "scheduled on NL [nurse line]." (*Id.*)

Defendant asserts that Plaintiff had an encounter with Nurse Rosario on June 22, 2022. (*Id.* at 46.) In the medical record for this encounter, Nurse Rosario noted Plaintiff's prior HNRs and the complaints therein and documented Plaintiff's report that he felt his retina was detached because he could barely see peripherally, he was worried about becoming fully blind, and he wanted to see optometry. (*Id.* at 46–47.) Nurse Rosario assessed "disturbed visual sensory perception r/t [related to] loss of vision." (*Id.* at 51.)

Plaintiff avers that he was never seen on the nurse line for his eye issues, and he expressly states that he was not seen by any medical staff on June 22, 2022. (Doc. 76-1 at 20, Pl. Decl.; Doc. 75 at 7.)

On June 22, 2022, Nurse Rosario completed a Consultation Request form for Plaintiff to see the optometrist for "loss of left eye vision." (*Id.* at 56.) Nurse Rosario noted that priority status for this request was "routine." (*Id.*) The Consultation Request form shows that authorization for the consult was obtained on June 23, 2022. (*Id.* at 57.)

---

[4] It appears that a "Health Service Request" is an electronic HNR submitted via a prisoner tablet, whereas an HNR is a handwritten form submitted to medical. (*See* Doc. 56 at 12, 18 (Health Services Request documenting Pl.'s medical request without written HNR form); Doc. 75 at 6 (Pl.'s assertion that he filed at least 8 HNRs on paper and submitted numerous HNRs electronically).)

On July 2, 2022, Plaintiff submitted an HNR stating that he has been blind in his left eye since May 16, 2022, and that he had filed multiple HNRs only to be told "appointment scheduled." (*Id.* at 60.) He wrote that he is blind in his left eye, and he needed glasses for his right eye because it is out of focus, and he asked to be seen. (*Id.*) The July 3, 2022 HNR response informed Plaintiff that an optometry consult was approved and awaiting scheduling. (*Id.*)

On July 4, 2022, the optometry appointment was scheduled for July 13, 2022. (*Id.* at 57–58.)

On July 5, 2022, Plaintiff submitted an HNR stating that he needed to be seen because his left eye is blind, and he needed "close up" glasses. (*Id.* at 63.) He wrote that he had pain behind his left eye, and it felt like there was a pin behind his eye. (*Id.*) The July 11, 2022 response informed Plaintiff that he was scheduled on the nurse line. (*Id.*)

On July 6, 2022, Plaintiff submitted an HNR stating that he needed to see the eye doctor because his left eye was "blinded with blobs" and he needed glasses for his right eye. (*Id.* at 61.) He wrote that the backside of his left eye hurt. (*Id.*) The July 22, 2022 response informed Plaintiff that he was scheduled to see the optometrist soon. (*Id.*)

On July 13, 2022, Plaintiff saw an optometrist, who diagnosed left eye retinal detachment and documented "refer to retinal specialist ASAP." (*Id.* at 58.) The optometrist also diagnosed presbyopia in the right eye and recommended prescription reading glasses. (*Id.*)

On July 13, 2022, Physician Assistant (PA) Katie Lenhart submitted a Consultation Request form for an urgent referral to ophthalmology for left eye retinal detachment and one post operative follow up. (*Id.* at 64.) The consult request was referred to the Centurion Utilization Management Team for review, and, on July 19, 2022, authorization for the consult was approved. (*Id.* at 65.) The following day, an ophthalmology appointment was scheduled. (*Id.*)

On July 14, 2022, Plaintiff submitted an HNR stating that he saw the optometrist, who informed him that he needed eye surgery to reconnect the retina within days or he will

lose sight in his left eye. (*Id.* at 72.) Plaintiff wrote that he is a Massachusetts state prisoner housed pursuant to an interstate compact, that Massachusetts pays for his medical care, and he asked that arrangements be made for surgery; "please I need my sight." (*Id.*) The electronic record of this HNR noted that this was a duplicate HNR, and there no record of a response given to Plaintiff. (*Id.*)

On July 19, 2022, Plaintiff submitted an HNR stating that he required eye surgery. (*Id.* at 73.) He wrote that his eye was throbbing and cold, and that his eye has progressed such that he may lose his vision even after surgery. (*Id.*) Plaintiff asked, "why am I being denied to see a nurse??? I need to be seen and you know now my retina is detached." (*Id.*) The medical record shows that this HNR was documented as not urgent, and Plaintiff was informed on July 20, 2022 that a consult was scheduled that week. (*Id.*)

On July 21, 2022, Plaintiff saw Dr. Melissa Pongratz, an ophthalmologist, in Goodyear, Arizona. (*Id.* at 66–70.) Dr. Pongratz conducted a thorough examination and assessed total retinal detachment in the left eye and referred Plaintiff for surgical repair. (*Id.*) She also assessed puckering of macula in the right eye, which could require surgical repair if it progressed; vitreous degeneration; and chorioretinal scars in the right eye, which required monitoring. (*Id.* at 69.)

On July 22, 2022, PA Lenhart submitted a Consultation Request form for urgent surgical repair for left eye retinal detachment with one post-operative follow up. (*Id.* at 74.) The consult request was referred to the Centurian Utilization Management Team for review, and the request was approved on July 26, 2022. (*Id.* at 75.) On July 27, 2022, the surgery appointment was scheduled. (*Id.*)

On July 26, 2022, Plaintiff submitted an HNR stating that his family told him Massachusetts had agreed to pay for retina reattachment surgery and that he needs this surgery or he will be blind in his left eye. (*Id.* at 80.) He asked if he was getting surgery. (*Id.*)

On July 27, 2022, Plaintiff submitted another HNR stating that, on July 21, 2022, he was told by the eye clinic that he needed urgent surgery and he asked, "am I getting this

surgery?????  Please acknowledge please." (*Id.* at 81.)

The electronic medical record shows that nurses viewed the July 26 and 27 HNRs on July 29, 2022, deemed the HNRs as not urgent, and informed Plaintiff that surgery was scheduled. (*Id.* at 80–81.)

On August 1, 2022, Dr. Suhail Alam performed surgery on Plaintiff's left eye. (*Id.* at 76.)

On August 18, 2022, Plaintiff had a surgical follow-up appointment with Dr. Alam. (*Id.* at 87.)[5]  Dr. Alam recommended another follow up in one month. (*Id.*)

On August 23, 2022, PA Lenhart submitted a Consultation Request form for a one-month follow-up appointment with ophthalmology. (*Id.* at 89.)

On September 12, 2022, Plaintiff had a follow-up appointment with Dr. Alam. (*Id.* at 91.)  Dr. Alam noted that the retina was attached and doing well, and he ordered another follow up in one month. (*Id.* at 92–95.)

On September 15, 2022, NP Susan Thompson submitted a Consultation Request form for a one-month follow-up appointment with ophthalmology. (*Id.* at 96.)  On September 29, 2022, the consult request was approved, and an appointment was scheduled. (*Id.* at 97.)

Despite undergoing surgery, Plaintiff remains blind in his left eye, and he wears a surgical band around his left eye to hold the retina in place. (Doc. 76 at 3, Pl. Decl.)  As a result of having to wear this band, Plaintiff suffers frequent and intense migraine headaches. (*Id.*)  He also uses eye drop medication to reduce pressure in his eye and must use this medication for the rest of his life. (*Id.*)

**IV.  Legal Standard for § 1983 Liability Against Defendant**

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom

---

[5] Defendant did not submit the medical record from the August 18, 2022 follow-up appointment with Dr. Alam. (*See* Doc. 56.)

promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show that (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

## V.  Discussion

### A.  Constitutional Injury

#### 1.  Eighth Amendment

To establish a violation of the Eighth Amendment based on inadequate medical care, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately

indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**2.    Analysis**

Defendant asserts generally that Plaintiff cannot establish the objective prong in the deliberate indifference test. (Doc. 55 at 10.) But there is no dispute that Plaintiff suffered a detached retina, which many courts have held is a serious medical need. *Browning v. Snead*, 886 F. Supp. 547, 552 (S.D. W.Va. 1995) (a detached retina is a serious medical condition); *Hanson v. Blaine County*, No. 1:16-cv-00421-BLW, 2018 WL 3370526, at * 5 (D. Id. Jul 9, 2018) ("[a] detached retina may constitute a serious medical need"); *Herrera-Cubias v. Fox*, No. 08-CV-0517-TUC-AWT, 2012 WL 12539503, at *4 (D. Ariz. Sept. 10, 2012) ("courts have held that a detached retina is a serious medical need because it causes discomfort, necessitates surgery, and can lead to blindness") (citations omitted). Before he was diagnosed with a detached retina, Plaintiff suffered vision loss in one eye, which by itself constitutes a serious medical need. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) ("monocular blindness is the loss of the function of an organ" and "is a serious medical need" and noting that other courts have held that "even less severe losses of vision are serious medical needs"). In addition, Plaintiff suffered pain in his eye, his condition affected his daily activities, and he had to undergo surgery, thereby establishing that he

suffered from a serious medical need. *See McGuckin*, 974 F.2d at 1059–60. Plaintiff satisfies the first element in the deliberate indifference analysis.

The Court therefore turns to the subjective prong of the analysis, and whether Defendant's response to Plaintiff's serious medical need exhibited deliberate indifference.

Defendant argues that "the first time [Defendant's] medical personnel became aware of an officially documented left eye issue was after Plaintiff was diagnosed with what was believed to be a detached retina on July 13, 2022," and that "further evaluation and surgical intervention was not medically indicated until at least July 13, 2022." (Doc. 55 at 11.) Defendant notes that, from May 26 through June 14, 2022, Plaintiff had five mental health encounters with Defendant's mental health staff, and, according to the medical records, Plaintiff did not mention an issue with his left eye or any distress at any of these encounters. (Doc. 55 at 3 n.2.) Defendant also explains the delay in scheduling Plaintiff for an appointment as simply due to "some inexplicable reason." (Doc. 55 at 10; Doc. 78 at 5 ("it is unclear from any available record why this occurred again in early June).)

Defendant's argument that it was unaware of Plaintiff's serious medical need is belied by the evidence. The record shows that, starting in May and through June and early July, Plaintiff submitted at least 12 HNRs clearly informing Defendant's medical personnel that he was losing or had lost vision in his left eye, he had pain in his eye, and he was freaking out about being blind in his left eye. (Doc. 56 at 9–10, 13, 17–18, 60–61, 63; Doc. 76-1 at 36–38; *see* Doc. 76 at 6.) The inference can be made that Defendant's medical personnel were aware of Plaintiff's HNRs detailing his serious eye symptoms and asking to be seen. *See Jett*, 439 F.3d at 1094, 1097 (finding that as the party opposing summary judgment, the plaintiff was entitled to an inference that the defendant prison doctor was aware of the medical slips the plaintiff submitted asking to be sent to a specialist for treatment for a fractured thumb). A June 22, 2022 medical record documented Plaintiff's numerous HNRs and his specific complaints of serious symptoms. (Doc. 56 at 46–47.) This evidence supports that Defendant's medical personnel were aware of Plaintiff's

ongoing eye symptoms and serious medical need starting in May 2022. *See Petty v. Shojaei*, No. EDCV 12-1220 JAK (SS), 2013 WL 5890136, at *10 (C.D. Cal. Oct. 31, 2013) (noting that telling prison staff of a medical need was sufficient to allege the subjective component of an Eighth Amendment claim); *see also Lolli*, 351 F.3d at 421 ("deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm" or if the risk of harm was obvious) (citing *Farmer v. Brennan*, 511 U.S. at 825 842 (1994)).

Plaintiff disputes Defendant's claim that he never raised his eye issues during his mental health encounters. (Doc. 75 at 9.) Plaintiff avers that he complained to everyone who came to his cell, and he asserts that he "absolutely" mentioned his eye problems at his mental health encounters, and that, in response, on July 22, 2022, Dr. John Keep increased Plaintiff's mental health medications dosages. (*Id.*; Doc. 76-1 at 44, Pl. Decl.) The Court must take as true Plaintiff's assertion that, in addition to his HNRs, Plaintiff complained to Defendant's mental health providers about his serious eye issues.

The Court must also take as true Plaintiff's assertion that he was not seen on June 22, 2022. (Doc. 75 at 7.)[6] The evidence shows that, even assuming there was no appointment that day, a nurse documented Plaintiff's numerous HNRs and, despite noting Plaintiff's complaints of vision loss and eye pain, the nurse submitted a "routine" consult request for the onsite optometry clinic. (Doc. 56 at 46–52.) Consequently, Plaintiff did not see the optometrist for another 21 days. On this record, Plaintiff began filing numerous HNRs on May 21, 2022 about his need to be seen because he was going blind; however, Plaintiff's first medical appointment to address this issue was not until the optometrist encounter on July 13, 2022, a delay of 53 days.[7]

---

[6] Plaintiff notes that the medical record for the purported June 22, 2022 encounter reflects that the nurse saw Plaintiff at 6:22 p.m. (Doc. 75 at 7, citing Doc. 56 at 46.) Plaintiff explains that no prisoners are seen by nurses at this time in the evening. (Doc. 75 at 7.) In its Reply, Defendant did not respond to Plaintiff's assertions that he was not seen on this date and that nurses do not see prisoners for appointments in the evening hours. (*See* Doc. 78.)

[7] The parties dispute whether Defendant's staff failed to comply with an ADCRR

- 12 -

Notably, after the nurse submitted the "routine" Consultation Request form on June 22, 2022, Defendant authorized the consult the following day (albeit, Defendant did not schedule Plaintiff with the optometrist for another 21 days). (*Id.* at 57.) But on July 13, 2022, when the PA submitted an "urgent" Consultation Request form for Plaintiff to see an ophthalmologist pursuant to the optometrist order that he see a specialist ASAP, Defendant did not authorize the consult until July 19, 2022. (*Id.* at 64–65.) Also, when a PA submitted an "urgent" Consultation Request for surgical repair for retinal detachment on July 22, Defendant did not authorize the consult until July 26, 2022. (*Id.* at 74.) Defendant acknowledges that surgical intervention was medically indicated following the optometrist's findings on July 13, 2022; however, Defendant does not explain the six-day and four-day delays in responding to the "urgent" requests for specialist and surgical treatment.

A reasonable jury could find that Defendant's medical personnel failed to respond to Plaintiff's known serious medical need for over 50 days, did not treat Plaintiff's condition as urgent even though he reported he was blind and was "freaking out," failed to timely schedule an appointment when he was finally referred to an optometrist, and failed to timely approve "urgent" requests for specialist and surgical treatment. A reasonable jury could conclude that this conduct delayed medically necessary treatment and amounted to deliberate indifference to Plaintiff's serious medical need. *See Wood*, 900 F.2d at 1334; *McGuckin*, 974 F.2d at 1060–61 ("a finding that the defendant repeatedly failed to treat an inmate properly . . . strongly suggests that the defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical needs").

The final element in the deliberate indifference analysis requires Plaintiff to show that Defendant's deliberate indifference caused harm. *See Jett*, 439 F.3d at 1096

---

policy stating that prisoners will be seen within 24 hours after an HNR is received. (Doc. 75 at 8; Doc. 78 at 4.) Because a failure to follow prison policy does not establish a constitutional violation, the Court need not address the parties' arguments on this issue. *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to follow state departmental regulations do not establish a constitutional violation); *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001) ("[T]here is no § 1983 liability for violating prison policy").

Defendant argues that Plaintiff cannot show he suffered any injury because of alleged deliberate indifference by its medical staff. (Doc. 55 at 11.) Defendant maintains that any alleged injury Plaintiff claims he suffered, including blindness, cannot be tied to a delay in receiving surgery without expert testimony. (*Id.* at 12.)

Expert testimony is not required to prove an Eighth Amendment deliberate indifference claim. *See, e.g.*, *Sanders v. York*, 446 F. App'x 40, 43 (9th Cir. 2011) (deliberate indifference claim did not require expert testimony); *Gordon v. Washington*, No. CV-09-05069RBL, 2010 WL 1406166, at *1–2 (W.D. Wash. Apr. 2, 2010) (unlike medical malpractice, expert testimony is not required to establish deliberate indifference claim); *see also Irvin v. Maricopa Cnty. Bd. of Sup'rs*, No. CV 07-0623-PHX-RCB, 2006 WL 3287037, at *3, 6 & n.8 (D. Ariz. Aug. 8, 2008) (noting that the requirement for expert testimony under Ariz. Rev. Stat. § 12-2603 had no bearing on the plaintiff's Eighth Amendment deliberate indifference claim because there was no federal procedural requirement that a plaintiff present expert witness testimony on a federal deliberate indifference claim). Courts have held that expert testimony is not required where a prisoner alleges that delayed treatment for a detached retina exhibited deliberate indifference because "expert evidence is not required when the type of conduct required by the circumstances is within common knowledge[,]" and "[i]t is within the common knowledge of laymen that an individual complaining of debilitating eyesight should see an eye specialist." *Herrera-Cubias*, 2012 WL 12539503, at *7 (citing *Hutchinson*, 838 F.2d at 393 n.1); s*ee McClure v. Chen*, No. 1:14-cv-00932-DAD-GSA, 2018 WL 4350083, at *2 (E.D. Cal. Sept. 11, 2018) (stating that the prisoner plaintiff was not required to have a qualified expert witness to survive summary judgement because "plaintiff need not prove he would now be able to see had the detached retina surgery been timely performed in order to prevail on an Eighth Amendment deliberate indifference claim").

"Proximate cause is a question to be decided by a jury," and if the plaintiff offers evidence that allows the jury to infer that a delay in treatment harmed the plaintiff, there is enough causation evidence to reach trial without expert testimony. *Gayton v. McCoy*, 593

F.3d 610, 624 (7th Cir. 2010); *see Haflich v. McLeod*, No. CV 09-161-M-DWM-JCL, 2011 WL 71435, at *3 (D. Mont. Jan. 10, 2011) (§ 1983 plaintiff's own testimony about physical pain and shortness of breath he felt when tased was sufficient and expert testimony was not required to establish causation).

There is sufficient evidence in the record—primarily Plaintiff's numerous HNRs—that would allow a jury to conclude Plaintiff suffered worsening symptoms, impaired vision, and pain and anguish during the time he was denied any treatment by Defendant. This is sufficient to satisfy the harm element in the deliberate indifference analysis. *See Estelle*, 429 U.S. at 103–04 ("[i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency") (internal citations omitted); *Jett*, 439 F.3d at 1096 (holding that a prisoner "need not show his harm was substantial"); *McGuckin*, 974 F.2d at 1060 (noting that, while a prisoner must show the denial of medical treatment was harmful, there is no requirement that the denial "resulted in 'substantial' harm to the prisoner"); *Delker v. Maass*, 843 F. Supp. 1390, 1398–99 (D. Or. 1994) (noting a delay in medical treatment "need not cause permanent injury" in order to be actionable and finding that "needless pain, anxiety, and restricted body function" was sufficient).

### B.     Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the

1  conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99
2  F.3d 911, 918 (9th Cir. 1996).  While one or two incidents are insufficient to establish a
3  custom or practice, the Ninth Circuit has not established what number of similar incidents
4  would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*,
5  No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could
6  conclude that at least a dozen instances of defendant Corizon denying or delaying
7  consultations and radiation treatment for cancer patient over a year amount to a custom or
8  practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478).  But "[t]here is no
9  case law indicating that a custom cannot be inferred from a pattern of behavior toward a
10 single individual." *Id.*; *see Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) ("[t]o
11 establish a widespread custom or policy, the plaintiff here was not required to show that
12 Cook County's alleged repeated pattern of delay . . . actually caused pain and suffering to
13 other inmates in need of medical intervention").  Whether actions by entity officers or
14 employees amount to a custom "depends on such factors as how longstanding the practice
15 is, the number and percentage of officials engaged in the practice, and the gravity of the
16 conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL
17 2850016, at *4 (N.D. Cal. Oct. 4, 2006).

18 Defendant acknowledges that there were some initial delays in scheduling an
19 appointment for Plaintiff but asserts that, although the reason for the initial delays is
20 unclear, "these couple of isolated delays in the first 30 [days] following [Plaintiff's]
21 complaint cannot be said, especially where appointments were even set and HNRs
22 addressed, as a matter of law, to amount to widespread practice of deliberate indifference."
23 (Doc. 78 at 5–6.)

24 Defendant's argument rests on its version of the facts; namely, that there was just
25 "some mere delay at the outset," that nurses were setting appointments for Plaintiff, that
26 Plaintiff saw a nurse on June 22, 2022, and that Plaintiff timely saw an optometrist
27 following the June 22, 2022 encounter.  (Doc. 55 at 10; Doc. 78 at 5.)  But according to
28 Plaintiff's supported facts, which must be taken as true at summary judgment, Plaintiff did

not see a medical staff member until July 13, 2022, 53 days after filing the first of many HNRs that described loss of vision and pain his eye and expressed his need to see a doctor. The evidence shows that Plaintiff filed three HNRs in May 2022—one response told him "appointment scheduled" despite no evidence of a scheduled appointment, and there were no responses to the other two. (Doc. 56 at 9, 46; Doc. 76-1 at 36.) Thereafter, Defendant's staff did not respond to three of Plaintiff's June 2022 HNRs, and in response to a fourth HNR, Plaintiff was told an appointment was scheduled, yet no appointment occurred. (Doc. 56 at 37, 72; Doc. 76-1 at 37–38.) Defendant's staff took 6 days to respond to Plaintiff's July 5, 2022 HNR to tell him he was scheduled for the nurse line, though there is no evidence a nurse appointment was scheduled. (Doc. 56 at 63.) And Defendant's staff took 16 days to respond to Plaintiff's July 6, 2022 HNR. (*Id.* at 61.) This was not a couple of isolated delays in scheduling Plaintiff or responding to HNRs. Instead, for months Defendant's staff routinely and repeatedly failed to respond reasonably—or failed to respond at all—to Plaintiff's HNRs regarding a serious medical need.

The record also shows that it was not a single nurse who received Plaintiff's HNRs and either failed to respond, failed to timely respond, or responded with incorrect information. Rather, multiple different staff members repeatedly exhibited the same disregard in response to Plaintiff's HNRs, thereby supporting that their conduct was standard practice. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation).

Finally, the evidence demonstrates that, in response to Plaintiff's first report in May 2022 until he was finally seen by an optometrist on July 13, 2022, Defendant's staff repeatedly documented that Plaintiff's symptoms of vision loss and eye pain were not "urgent" and required only "routine" medical treatment. (*See, e.g.*, Doc. 56 at 9, 13, 80–81.) When PAs finally submitted "urgent" consult requests for a specialist appointment and surgery, it took Defendant six days and four days respectively to approve the requests. (*Id.* at 64–65, 73–74.) This evidence shows that Defendant's staff exhibited a collective

1 lack of urgency towards Plaintiff's serious medical need.

2 In sum, based on the ongoing pattern of disregard by virtually all of Defendant's medical staff who were aware of Plaintiff's serious medical need from May until August 2022, a reasonable jury could find that staff was acting pursuant to a policy, practice, or custom. *See Mi Pueblo San Jose, Inc.,* 2006 WL 2850016, at *4.

### C. Deliberately Indifferent Policy/Moving Force

Deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results. *See Wood*, 900 F.2d at 1334. It follows that an ongoing policy or practice that denies specialist care or effective treatment for serious medical need—such as vision loss—and thereby causes harm would amount to a reckless disregard and constitute an objectively deliberately indifferent policy.

To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact whether there existed a policy or custom of disregarding requests for care and denying or delaying adequate treatment for a serious medical need. An obvious consequence of such a policy or custom may be the denial of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied. *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Based on the above, there exists a question of fact whether Defendant had a deliberately indifferent policy or custom that deprived Plaintiff of his constitutional rights. Summary judgment will be denied as to the policy claim against Defendant.

### VI. Punitive Damages

Defendant argues that it is entitled to summary judgment on Plaintiff's request for punitive damages. (Doc. 55 at 12.)

A request for punitive damages is not a separate claim, but rather a request for a particular relief as to Plaintiff's Eighth Amendment claim. Whether punitive damages are warranted is an issue reserved for the jury. *See Pacific Mut. Life Ins. Co. v. Haslip*, 111 U.S. 1, 16 (1991) (noting that, with respect to punitive damages, "[t]his has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case") (quotation omitted); *Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion"). A jury may assess punitive damages in a § 1983 action when a defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

A reasonable jury could conclude that conduct by Defendant was motivated by a "reckless or callous indifference to the federally protected rights of" Plaintiff, thereby warranting punitive damages. *Id.* The request for summary judgment as to punitive damages will therefore be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 55).

(2) Defendant's Motion for Summary Judgment (Doc. 55) is **denied**.

(3) This action is referred to Magistrate Judge Michael T. Morrissey to conduct a settlement conference.

(4) Defense Counsel shall arrange for the relevant Parties to jointly call Magistrate Judge Morrissey's chambers at (602) 322-7680 within 14 days to schedule a date for the settlement conference.

Dated this 10th day of September, 2025.

Michael T. Liburdi
United States District Judge